UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STEVEN LEE and STEVEN LEE GOLF INC.,

                                    Plaintiffs,                    **REPORT AND**
                                                                  **RECOMMENDATION**
            -against-
                                                                  18-cv-3167 (JMA)(SIL)
THE TOWN OF SOUTHAMPTON, THE
SOUTHAMPTON TOWN POLICE
DEPARTMENT, SERGEANT WILLIAM
KIERNAN *in his official capacity as a Police*
*Officer of the Town of Southampton Police*
*Department*, RUSSELL A. KRATOVILLE *in his*
*official capacity as the Town of Southampton*
*Management Services Administrator*, TIFFANY
S. SCARLATO *in her official capacity as the*
*Town Attorney for the Town of Southampton*,
JOHN DOE *a person or firm whose name is*
*currently unknown*, ERIC SCHULTZEL, and
ROB CORCORAN,

                                    Defendants.
-------------------------------------------------------------x

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this civil rights action are Defendants' motions to dismiss and for sanctions, and Plaintiffs' cross-motion for leave to amend their complaint. Plaintiffs Steven Lee ("Lee") and Steven Lee Golf Inc. ("SLG," and together with Lee, "Plaintiffs") commenced this action on May 30, 2018 against Defendants The Town of Southampton (the "Town"), The Southampton Town Police Department (the "STPD"), Sergeant William Kiernan in his official capacity as a Police Officer of the Town of Southampton Police Department ("Kiernan"), Russell A. Kratoville in his official capacity as the Town of Southampton Management Services Administrator ("Kratoville"), Tiffany S. Scarlato in her official capacity as the Town

Attorney for the Town of Southampton ("Scarlato"), John Doe a person or firm whose name is currently unknown ("Doe," and collectively with the Town, the STPD, Kiernan, Kratoville, and Scarlato, the "Southampton Defendants"), Eric Schultzel ("Schultzel," and together with the Southampton Defendants, "Defendants"), and Rob Corcoran ("Corcoran"),[1] alleging, *inter alia*: (i) violations of their civil rights pursuant to 42 U.S.C. § 1983 ("Section 1983") and related New York State laws; and (ii) breach of contract and tortious interference (and conspiracy to tortuously interfere) with contract under New York State law. *See generally* Complaint ("Compl."), Docket Entry ("DE") [1]. Presently pending, on referral from the Honorable Joan M. Azrack for Report and Recommendation, are: (a) The Southampton Defendants' and Schultzel's motions to dismiss the Complaint against them pursuant to Fed. R. Civ. P. 12(b)(6), DEs [46], [50]; (b) Schultzel's motion for sanctions against Plaintiffs and their counsel under Fed. R. Civ. P. 11, DE [56]; and (c) Plaintiffs' cross-motion (in response to the motion for sanctions) for leave to file an amended complaint pursuant to Fed. R. Civ. P. 15(a)(2), DE [60]. For the reasons set forth below, the Court respectfully recommends granting Defendants' motions to dismiss and denying Schultzel's motion for sanctions and Plaintiffs' cross-motion for leave to file an amended complaint, as detailed herein.

---

[1] Plaintiffs voluntarily dismissed the action with prejudice as against Corcoran on December 5, 2018. *See* DEs [33] – [34], 40.

## I.     Background

### A.     <u>**Relevant Facts**</u>

The following facts are taken from the Complaint and various documents filed in connection with Defendants' motions to dismiss.[2]   The Complaint's factual allegations are accepted as true unless conclusively contradicted by additional materials considered by the Court, as more fully discussed below.

Since approximately August 2013, the Town has owned the Poxabogue Golf Center (the "Golf Center"), a public golf facility containing a nine-hole golf course, pro shop, and driving range, located at 3556 Montauk Highway, Sagaponack, New York. *See* Compl. ¶ 22.  On or about June 5, 2013, the Town entered into a license agreement with SLG, which is owned by Lee, whereby SLG would operate, maintain, and manage the Golf Center in exchange for payment of an annual license fee to the Town (the "License Agreement").  *See id*. ¶¶ 23-28.[3]  The License Agreement entitled SLG to retain all revenues derived from operating the Golf Center, less expenses to maintain the premises.  *See id*. ¶ 26.  Once SLG started running the Golf Center, it began surveilling the property using cameras that were previously installed.  *See id*. ¶ 44.  Lee posted at least two signs informing customers that the premises were under 24-hour surveillance.  *See id*.

In managing the Golf Center, SLG hired instructors, including Schultzel and Corcoran, as independent contractors, to give private and group lessons to patrons.

---

[2] *See* Section II(A)(i)(a), *infra*.

[3] The annual fee was initially $49,000 and increased to $70,000 in 2015.  *See* Compl. ¶¶ 26, 28.

*See id*. ¶¶ 31-32.  SLG arranged a monetary split with its instructors whereby the instructors would keep 60% of "profits" and SLG would receive the other 40%.  *See id*. ¶¶ 32-33.  In May 2015, Schultzel and Corcoran complained about their share of the fees, and SLG subsequently adjusted the split to 65%/35% in favor of the instructors, but only for private lessons.  *See id*. ¶ 33.  Corcoran was unhappy that the revised breakdown did not apply to group lessons, and thereafter would only give private lessons.  *See id*. ¶ 34.  During the spring and summer of 2015, Schultzel began leaving the Golf Center early and, as a result, missing scheduled lessons.  *See id*. ¶ 35.  Thus, Lee reprimanded Schultzel and told him that if he was not going to show up for his lessons, SLG would need to hire more instructors to fill the void.  *See id*. ¶ 36.  Thereafter, Schultzel's and Corcoran's relationship with Lee was strained.  *See id* ¶¶ 34, 37.  SLG ultimately terminated its arrangement with Corcoran on September 6, 2015 because of his continued failure to fulfil his teaching obligations. *See id*. ¶ 56.

On July 25, 2015, Lee looked out his office window located in the Golf Center's pro shop (the "Window") and saw a "young woman" sitting on a bench outside, looking at her cellphone and wearing shorts and a t-shirt.  *See id*. ¶ 38.  According to Plaintiffs, the Window was transparent and overlooking a public area that was regularly traversed by customers, and the bench was near one of the signs informing patrons that the premises were under surveillance.  *See id*. ¶¶ 43-44.  Lee then took a picture of the girl with his cellphone (the "Photograph") while remaining inside in his office in a what he characterizes as a "conspicuous manner."  *See id*. ¶ 39.

According to Plaintiffs, the Photograph depicts a "chin-down image of a seated person of indeterminate age and sex, with one leg bent at the knee, holding a cell phone in both hands in front of his/her chest … [with] no portion of the person's face above the chin and no hair … visible." *See id*. ¶¶ 40.  The Court's review of a copy of the Photograph provided by Plaintiffs indicates that the girl's crotch, and a portion of her right buttock, is at the center of the picture and that, although she is clothed, her shorts are moved to the side such that a portion of her pubic area is covered only by an undergarment.  *See* Declaration of Patricia M. Meisenheimer in Opposition to Schultzel's Motion to Dismiss ("Meisenheimer Decl."), DE [48-2], Ex. B (a copy of the Photograph).  Also on July 25, 2015, Lee showed the Photograph to Schultzel and described the manner in which he had taken it.  *See* Compl. ¶ 45.  That same day, Schultzel discussed the image with Corcoran.  *See id*. ¶ 46.

On or about July 30, 2015, Schultzel wrote to Kratoville, the Town Management Services Administrator, seeking to schedule an appointment to "discuss 'the future of [the Golf Center].'"  *See id*. ¶¶ 13, 47.  Schultzel followed-up by email on or about August 5, 2015, stating that he needed to "report an urgent matter regarding the future of [the Golf Center]."  *See id*. ¶ 48.  Kratoville met with Schultzel and Corcoran on August 11, 2015, and purportedly discussed whether Lee taking the Photograph was grounds to terminate the License Agreement and whether Schultzel and/or Corcoran might be able to take over managing of the Golf Center in the event the Town terminated its arrangement with SLG.  *See id*. ¶¶ 49-50.  There is no allegation that Defendants discussed terminating the License Agreement prior to this

incident. At the time of this meeting, Kratoville was one of three members – along with his then fiancé and now wife, Scarlato, the Town Attorney – of the Poxabogue Request for Proposal ("RFP") Review Committee (the "Committee"), which was charged with evaluating proposals to operate the Golf Center and making recommendations concerning its licensing to the Town's Board.[4] *See id.* ¶¶ 17, 51-52, 112. Kratoville told Schultzel and Corcoran that he would "look favorably on the possibility of their managing [the Golf Center]." *See id.* ¶ 53.

On September 9, 2015, Kratoville informed Schultzel and Corcoran that he had spoken to Chief Pearce ("Pearce") of the STPD about the incident they had described to him and encouraged them to prepare a written statement detailing their account. *See id.* ¶ 57. Rather than drafting a document himself, Schultzel contacted Harry Hurt ("Hurt"), a freelance writer, to prepare a statement on his behalf (the "Statement"). *See id.* ¶ 58.[5] Hurt, who was not present when the Photograph was captured and had never seen the image or spoken to Lee, drafted of the Statement and emailed it to Schultzel for review. *See id.* ¶¶ 59, 61. Schultzel reviewed the Statement before sharing the final version with Kratoville, who then forwarded it to Pearce on September 14, 2015. *See id.* ¶¶ 60, 63. The Statement purportedly contains inaccurate, misleading, and inflammatory information, explaining that Lee "stated he had shot the Photograph through a two-way mirrored window" and that the image "'showed the private lower area' of a teenage girl." *See id.* ¶¶ 59, 62, 64; *see also*

---

[4] Plaintiffs do not identify the third member of the Committee.

[5] The Complaint does not allege that Corcoran ever composed a written statement.

Declaration of Theodore D. Sklar in Support of the Southampton Defendants' Motion to Dismiss ("Sklar Decl."), DE [50-2], Ex. F-1, DE [51-3] (the "Criminal File," which contains a copy of the Statement).

On October 9, 2015, Schultzel supplemented the Statement with a supporting deposition to the STPD, attesting that the Photograph was of an "underage girl with her legs spread apart[,]" taken through a two-way mirror in Lee's office (*i.e.*, the Window). *See* Compl. ¶ 65. Two additional witnesses employed at the Golf Center, Howard Matheson ("Matheson") and John Haining ("Haining") corroborated Schultzel's story on September 30, 2015 and October 15, 2015, respectively. *See* Criminal File at 9 (the "Matheson Deposition"); *id.* at 8 (the "Haining Deposition," and together with the Matheson Deposition, the "Corroborating Depositions"). The Corroborating Depositions both allege that Lee admitted to taking the Photograph through the two-way mirror in his office, which they perceived as depicting a 14 or 15-year-old girl with her legs spread and underwear showing. *See id.*

On October 15, 2015, STPD officers visited the Golf Center and spoke to Lee in his office for "several minutes," giving them an opportunity to observe the allegedly transparent Window. *See* Compl. ¶¶ 67-68. Thereafter, purportedly "without probable cause to believe that Lee had committed any crime," the officers "placed" Lee into a police vehicle and transported him to STPD headquarters in Hampton Bays, New York. *See id.* ¶ 69. Lee claims that he "did not consent to going with the police" and went only because he "felt compelled and intimidated." *See id.* ¶ 70. The Complaint does not allege that he was taken to the station by force.

According to Plaintiffs, when the officers and Lee arrived at headquarters, Kiernan, a sergeant for the STPD, non-party police officer Michael Foos ("Foos"), and others "interrogated him without giving him his *Miranda* rights." *See id*. ¶ 71. To that end, Lee alleges that the interrogating officers used "unconstitutionally impermissible tactics [and] psychological intimidation" to "coerce[] Lee into producing his cell phone and without permission and without a search warrant, searched the cell phone in Lee's presence." *See id*. ¶ 72. According to the Criminal File, however, Lee signed or initialed a statement at least six times indicating that he had been advised of and waived his rights. *See* Criminal File at 4-5 ("Advice of Rights Form"). Lee claims that he was "told" to sign the Advice of Rights Form but does not state that he was compelled to do so and provides no factual explanation of what he is referring to when he alleges that he was subject to unlawful interrogation tactics. *See* Compl. ¶ 78. In addition, the Criminal File demonstrates that Lee signed a document consenting to the search of his iPhone (the "Phone"). *See* Criminal File at 6 (the "Consent to Search Form"). The Complaint does not mention the Consent to Search Form.

While searching the Phone, Kiernan saw the Photograph, which Lee admitted he took. *See id*. ¶¶ 73-74. Kiernan then confiscated the Phone without Lee's permission and left the room with it, eventually returning to inform him that the STPD was keeping the device, over Lee's objection, in connection with an investigation regarding a missing person. *See id*. ¶¶ 74-77. Thereafter, Lee was permitted to leave the police station. *See id*. ¶ 79. The Complaint does not allege

that there was ever a point when a request by Lee to leave headquarters was refused. In the days following his questioning at the station, Lee repeatedly called the STPD asking for his Phone back to no avail, until October 20, 2015, when he was instructed to come back to the station the next day to pick it up.  *See id.* ¶¶ 80, 81.

When Lee went to retrieve his Phone on October 21, 2015, six days after the initial questioning, he was arrested by Kiernan and others upon arrival (the "Arrest"). *See id.* ¶¶ 82-83, 94.  Lee was charged with:  (i) Unlawful Surveillance in the Second Degree ("Unlawful Surveillance"), a class E felony, N.Y. Penal Law § 250.45(4) ("A person is guilty of unlawful surveillance in the second degree when … (4) Without the knowledge or consent of a person, he … intentionally uses … an imaging device to surreptitiously view, broadcast or record, under the clothing being worn by such person, the sexual or other intimate parts of such person."); and (ii) Endangering the Welfare of a Child ("Child Endangerment"), a class A misdemeanor, N.Y. Penal Law § 260.10(1) ("A person is guilty of endangering the welfare of a child when … (1) He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old ….").  *See* Compl. ¶¶ 84-85.

According to Lee, Kiernan, Doe, the STPD, and the Town "knew or should have known" that he could not have been guilty of Unlawful Surveillance because he "had not acted surreptitiously" in light of the Window being transparent and the Photograph indicating that it had been taken at the eye level of a standing person such that Lee was "observable."  *See id.* ¶ 87.  In addition, Lee contends that because the STPD had his Phone for six days before arresting and charging him, Kiernan and

other officers were able to study the Photograph and learn that it did not include an image of "the sexual or other intimate parts" contemplated by the statute and that it was "taken from an angle that negated the possibility that it was the result of an 'under the skirt' camera." *See id.* ¶ 95. The Complaint further alleges that Kiernan, Doe, the STPD, and the Town "knew or should have known that Lee could not have been guilty of endangering the welfare of a child." *See id.* ¶¶ 89, 96. Thus, according to Lee, the arrest – which occurred absent his consent and prior to an indictment or judicial review – and subsequent prosecution were malicious and lacked probable cause. *See id.* ¶¶ 90-93, 97.

After the Arrest, the Town and STPD issued a press release prepared by Kiernan to Newsday and The Southampton Press, identifying Lee as the manager of the Golf Center, detailing the charges, and stating that Lee had taken a Photograph of "an underage female's crotch area through a one-way window"(the "Press Release"). *See id.* ¶¶ 98-99. The Press Release stated that the Town was concerned for the safety of its citizens and patrons of the Golf Center. *See id.* The news was "widely disseminated" by various outlets. *See id.* ¶ 124. On October 22, 2015, the day after the Arrest, Scarlato wrote a letter on her Town Attorney stationary purporting to terminate the License Agreement (the "Termination Letter"), despite purportedly having no authority to render such a decision absent a resolution by the Town Board. *See id.* ¶ 104. The Termination Letter instructed Lee to cease and desist from operating the Golf Center and immediately vacate the premises. *See id.* ¶ 105. On

October 27, 2015, the Town Board passed a resolution ratifying Scarlato's termination of the License Agreement.  *See id*. ¶ 106.

During the June/July 2016 Term of Grand Jury of Suffolk County, Lee was indicted for Unlawful Surveillance (the "Indictment").  *See id*. ¶ 107.  The Child Endangerment charge was dropped.  *See id*.  Plaintiffs allege that Schultzel knowingly provided false and misleading testimony to the Grand Jury by claiming that Lee took the Photograph through a "one-way mirrored window."  *See id*. ¶¶ 108, 173.[6]  A review of Schultzel's Grand Jury transcript, however, demonstrates that his testimony was as follows:

Q:  [D]id [Lee's office] have windows?

A:  Yes, it did.

Q:  Can you describe what these windows were like?

A:  There was one window with like a shaded film to block the sun.

Q:  Was it a two-way mirror?

A:  It was not a two-way mirror.

Q:  So it was a window with a shade, the film, you said?

A:  Yes.

Q:  So you mean like a tint?

A:  Like a tint.

---

[6] Plaintiffs' motion for leave to file an amended complaint seeks to withdraw paragraphs 108 and 173 of the Complaint.  *See* Section II(C), *infra*.  The instant motions to dismiss, however, are addressed to the original Complaint, which remains the operative pleading.

*See* Declaration of Robert M. Fantone in Support of Mr. Schultzel's Motion to Dismiss (the "Fantone Decl."), DE [46-2], Ex. GJ-1, the June 29, 2016 Grand Jury Testimony Transcript of Schultzel (the "Schultzel GJ Transcript") at 15:15-16:1.[7]  In other words, the Grand Jury heard testimony that the Window was tinted, rather than mirrored, prior to rendering the Indictment.  The Complaint further claims that Kiernan provided unidentified "false and misleading" testimony to the Grand Jury.  *See* Compl. ¶ 161.

On October 23, 2015, Schultzel  wrote to Kratoville, thanking him for helping to get Lee arrested and offering to take over the management of the Golf Center.  *See id.* ¶ 111.  The next day, Corcoran acknowledged that he and Schultzel intended to submit an RFP to operate the Golf Center and referred to Lee as "a very bad guy." *See id.* ¶ 112.  On October 25, 2015, Schultzel began managing the Golf Center and also acknowledged that he intended to submit an RFP.  *See id.* ¶ 114.  Shortly thereafter, Schultzel asked Kratoville for guidance on pursuing his RFP, an was informed that Kratoville had forwarded his information to Scarlato who should be the point of contact.  *See id.* ¶ 115.  Schultzel then reached out to Scarlato on October 30, 2015 to schedule a meeting with her along with Corcoran, his "business partner." *See id.* ¶ 116.  On December 22, 2015, the Town Board adopted a resolution awarding an eight-year license agreement for the operation of the Golf Center to Pin High Golf Management, LLC ("Pin High").  *See id.* ¶ 120.  The Complaint does not allege that Schultzel of Corcoran own or are affiliated with Pin High.  Instead, Plaintiffs claim

---

[7] As discussed below, the parties stipulated to the release of this transcript.  *See* Section II(B), *infra*; *see also* DE [39].

that Schultzel, in an April 4, 2016 email, stated that the Golf Center was a "very big disappointment … and a huge letdown from the [T]own officials that [he] worked with to bring light to the situation that the community was facing at [the Golf Center]. The gossip was that it was a done deal with who they wanted to bring in, even prior to the RFP coming out…." *See id*. ¶ 133.  In other words, the Complaint implies that Schultzel was never awarded a contract to operate the Golf Center.

In March 2017, the Honorable John Toomey presided over a jury trial in the Suffolk County Court on Lee's Unlawful Surveillance charge. *See* Compl. ¶¶ 117-18. On March 23, 2017, the jury found Lee not guilty, and the Indictment was dismissed. *See id*. ¶¶ 118-19.  The Town did not reinstate SLG's License Agreement after Lee's acquittal, causing him to "suffer[] a devastating loss of his career and … livelihood." *See id*. ¶¶ 122-23.  To that end, Lee had been a "PGA golf pro" for 26 years – his only occupation since college.  *See id*. ¶ 124.  Following the Arrest and prosecution, Lee has been unable to obtain a position in the golf industry.  *See id*. ¶ 125.  Specifically, Lee was:  (i) hired as a "First Assistant Golf Professional" at a golf management company, with promises of promotion if vacancies opened, but was terminated after three days when customers threatened to resign their memberships due to the criminal charges; (ii) given a sales position with a golf branding company, but was fired after two weeks because a competing salesperson informed his boss that Lee "had been arrested for child pornography"; and (iii) recruited for a management position at an indoor golf facility but ultimately told he was "not appropriate" for the position despite having the right experience.  *See* Compl. ¶¶ 126-28.

### B.    **Procedural History**

Based on the above, Plaintiff commenced this action on May 30, 2018. *See* DE [1]. The Complaint asserts the following causes of action on behalf of Lee: (i) false arrest against the Town, the STPD, Doe, and Kiernan pursuant to Section 1983 and New York State law; (ii) malicious prosecution against the Town, the STPD, Doe, Kiernan, and Schultzel pursuant to Section 1983 and New York State law; (iii) "deprivation of civil rights" against the Town and Kiernan pursuant to Section 1983; and (iv) "violating Lee's liberty interest under the Due Process clause of the Fourteenth Amendment" of the United States Constitution against the Southampton Defendants pursuant to Section 1983.[8] *See* Compl. ¶¶ 143-92. In addition, the Complaint asserts the following causes of action on behalf of SLG: (i) breach of contract against the Town for terminating the License Agreement; and (ii) tortious interference (and conspiracy to tortuously interfere) with the License Agreement against Kratoville, Scarlato, and Schultzel. *See id.* ¶¶ 199-225.[9]

On June 13, 2017, Plaintiffs served a Notice of Claim on the Southampton Defendants. *See* Compl. ¶ 137. The Complaint does not specify which causes of action were asserted in the Notice of Claim, but contends it was filed within 90 days of the accrual of the false arrest and malicious prosecution claims. *See id.* ¶ 138. In

---

[8] The Complaint also asserts a cause of action against the Southampton Defendants for violating Lee's liberty interest pursuant to New York State law. *See* Compl ¶¶ 193-98. This claim, however, was withdrawn. *See* Plaintiffs' July 5, 2018 Letter to the Court, DE [21], at 3; *see also* Pltfs.' Second Mem. at 7).

[9] All of the contract-based claims against the Southampton Defendants have been withdrawn. *See* DE [21], at 3; *see also* Pltfs.' Second Mem. at 7. Accordingly, all that remains in this context is tortious interference and conspiracy to tortuously interfere with contract against Schultzel.

connection therewith, Lee partook in a 50-h hearing on October 19, 2017.  *See id*. ¶ 141.

On June 28, 2018 and July 24, 2018, the Southampton Defendants and Schultzel, respectively, filed pre-motion conference letters indicating their intention to move to dismiss the Complaint as against them pursuant to Fed. R. Civ. P. 12(b)(6). *See* DEs [20], [23].  On December 7, 2018, Schultzel filed a motion to, *inter alia*, compel Plaintiffs to consent to the release of the sealed criminal records concerning Lee's prosecution so that Schultzel could adequately prepare his motion to dismiss. *See* DE [35].  After a December 14, 2018 hearing, Plaintiffs executed a stipulation, which the Court So Ordered, enabling Schultzel to obtain the sealed records.  *See* DEs [37] - [39].  Schultzel's motion to dismiss was fully briefed on March 8, 2019, *see* DE [46] *et seq*., and the Southampton Defendants' motion followed on March 22, 2019. *See* DE [50] *et seq*.

In their motion to dismiss, the Southampton Defendants argue that the Complaint fails as a matter of law because, *inter alia*:  (i) there is no plausible claim for municipal liability against the Town; (ii) the existence of probable cause negates any claims for false arrest or malicious prosecution; and (iii) Lee was not deprived of any protectable liberty interest.  *See generally* Memorandum of Law in Support of the Southampton Defendants Motion to Dismiss ("SH Mem."), DE [50-1].   In support of his motion, Schultzel argues that:  (a) he is not a state actor subject to liability under Section 1983; (b) Plaintiffs' failure to rebut the presumption of probable cause renders his malicious prosecution claim deficient; and (c) the contract-based tort claims

asserted against him should be dismissed both because they fail to state a claim as a matter of law and because the Court should decline to exercise supplemental jurisdiction over them.  *See generally* Memorandum of Law in Support of Schultzel's Motion to Dismiss ("ES Mem."), DE [46-1].

Approximately two months after the motions to dismiss were filed, Schultzel filed a motion for sanctions pursuant to Fed. R. Civ. P. 11, arguing, *inter alia*, that Plaintiffs' malicious prosecution cause of action against him is frivolous and based on allegations they knew to be materially false.  *See generally* Schultzel's Memorandum of Law in Support of Motion for Sanctions ("ES Sanctions Mem."), DE [58].  Plaintiffs opposed all of these motions and cross-moved for leave to file an amended complaint to delete paragraphs 108 and 173 of the Complaint, which were the subject of the sanctions motion.  *See generally* Plaintiffs' Memorandum of Law in Opposition to the Southampton Defendants' Motion to Dismiss ("Pltfs.' SH Mem."), DE [55]; Plaintiffs' Memorandum of Law in Opposition to Schultzel's Motion to Dismiss ("Pltfs.' ES Mem."), DE [48]; Plaintiffs' Memorandum of Law in Opposition to Schultzel's Motion for Sanctions [and in Support of Plaintiffs' Motion for Leave to File an Amended Complaint] ("Pltfs.' Sanctions Mem."), DE [59].[10]

On January 8, 2020, Judge Azrack referred the pending motions to this Court for Report and Recommendation.  *See* January 8, 2020 Order Referring Motions.

---

[10] Notably, Plaintiffs have not requested leave to file an amended complaint to cure the deficiencies outlined in Defendants' motions to dismiss.

## II.    Discussion

For the reasons set forth below, the Court respectfully recommends granting both motions to dismiss, denying the motions for sanctions and leave to amend, and closing this matter.  The Court addresses each motion in turn.

### A.    __Motions to Dismiss__

#### i.    <u>Legal Standard</u>

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009).  A complaint "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955).

In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the Complaint as true and draw all reasonable inferences in Plaintiffs' favor.  *See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).  To that end, the Court may consider:

> (1) facts alleged in the complaint and documents attached
> to it or incorporated in it by reference, (2) documents
> 'integral' to the complaint and relied upon in it, even if not
> attached or incorporated by reference, (3) documents or

> information contained in defendant's motion papers if
> plaintiff has knowledge or possession of the material and
> relied on it in framing the complaint … and (5) facts of
> which judicial notice may properly be taken under Rule
> 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (collecting cases) (internal quotations omitted).   Moreover, a plaintiff's "failure to include matters of which as pleaders they had notice and which were integral to their claim – and that they apparently most wanted to avoid – may not serve as a means of forestalling the district court's decision on a 12(b)(6) motion." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation, citation, and brackets omitted); *cf. Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 222 (2d Cir. 2004) (discrediting allegations "belied" by letters attached to the complaint).   Similarly, "[w]here a complaint's allegations contradict the terms of documents incorporated by reference, the documents control and [courts] need not accept as true the allegations in a complaint." *Governara v. 7-Eleven, Inc.*, No. 13-cv-6094, 2014 WL 4476534, at *2 (S.D.N.Y. Aug. 20, 2014) (internal quotations, citations, and brackets omitted).

### a.   *Documents Considered*

Applying these standards, the Court concludes that it is appropriate to consider multiple documents attached to Defendants' motion papers, which were in Plaintiffs' possession before filing the Complaint and instrumental in framing their allegations.

First, the Court considers the Schultzel Grand Jury Transcript, which is relied on with respect to Plaintiffs' claims.[11] *See* Compl. ¶ 108 ("Schultzel knowingly testified before the Grand Jury that the window through which Lee had taken the Photograph was a one-way mirrored window."); *id.* ¶ 173 ("Following the arrest of Lee, Defendant Schultzel gave false and misleading testimony before a Grand Jury."). Accordingly, Plaintiffs' argument that "testimony at the grand jury" is "irrelevant," *see* Pltfs.' SH Mem. at 9, is without merit.

In addition, the Court considers the Criminal File submitted by the Southampton Defendants, which includes, among other things: (i) the Statement; (ii) the Advice of Rights and Consent to Search Forms; and (iii) the Corroborating Depositions.[12] *See* Criminal File. In reaching this conclusion, the Court finds that these documents are relied on throughout the Complaint. *See*, *e.g.*, Compl. ¶¶ 57-64 (discussing the Statement and its purportedly "false and misleading" representations); *id.* ¶¶ 71, 147 (asserting that Lee was interrogated without being given his *Miranda* rights); *id.* ¶¶ 146, 162, Pltfs.' SH Mem. at 15 (claiming that Kiernan did not have "even an iota of trustworthy information that the Photograph was taken surreptitiously" and that Lee's arrest was "based entirely on the misrepresentation [of Schultzel's Statement]"); *id.* ¶ 179 (alleging that Lee's property

---

[11] This transcript, although part of the sealed criminal records released to Schultzel, was filed separately from the Criminal File provided by the Southampton Defendants.

[12] Plaintiffs do not dispute that they were in possession of the Criminal File prior to commencing suit. *See* Pltfs.' SH Mem. at 10 ("Defendants argue that the exhibits are 'integral' because the Plaintiff was in possession of them. Plaintiff may have had access to the exhibits, yet never had the opportunity to engage in discovery or depositions relating to the proffered exhibits.").

was searched and seized absent a warrant). *See Obilo v. City Univ. of City of New York*, No. 01-cv-5118, 2003 WL 1809471, at *3 (E.D.N.Y. Apr. 7, 2003) (considering an incident report, police complaint, and written statements, on a motion to dismiss that were "implicitly" referenced in a complaint that alleged false arrest and malicious prosecution of a "conspiratorial nature") (citing 5 *C. Wright & A. Miller, Federal Practice & Procedure* § 1327, at 489 & n. 15 (stating that when a "plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading")). Thus, Plaintiffs' contention that "the prior criminal file … was never mentioned, nor relied on in the Complaint," *see* Pltfs.' SH Mem. at 9, is similarly rejected.

The Court, however, will not consider the additional versions of the Photograph submitted by the Southampton Defendants, *see* Sklar Decl., Ex. F-1, as they reflect zoomed-in versions of the image that were taken of a cellphone displaying the original Photograph. Thus, the Court's conclusions as to the contents of the Photograph come solely from the copy produced by Plaintiffs. *See* Meisenheimer Decl., Ex. B.[13]

    ii.    <u>Analysis</u>

Applying the standards set forth above, and for the reasons set forth below, the Court concludes that the Complaint fails to state any plausible claims for relief and should be dismissed. The Court first addresses whether Plaintiffs have adequately

---

[13] The Court notes that Defendants' motions contained other exhibits that were irrelevant to the Court's analysis herein. Accordingly, the Court takes no position as to whether those documents could be considered at this stage.

pled Section 1983 liability against Defendants before turning to the merits of their causes of action.

As a preliminary matter, the STPD should be dismissed from this action because it is a non-suable entity. Plaintiffs do not dispute that the STPD "lacks an independent legal identity apart from the Town." *See* SH Mem. at 16-17. Courts regularly dismiss police departments, such as the STPD, as defendants. *See*, *e.g.*, *Licata v. Kaplan*, No. 16-cv2928, 2017 WL 6379606, at *5 (E.D.N.Y. Dec. 12, 2017) (dismissing police department from action as a non-suable entity because "[u]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued.") (collecting cases); *Stratakos v. Nassau Cty.*, No. 15-cv-7244, 2016 WL 6902143, at *2 (E.D.N.Y. Nov. 23, 2016) (same). Accordingly, the Court respectfully recommends dismissing the STPD from this action.

The Court next considers whether the Complaint adequately alleges that the remaining Defendants may be held liable for the conduct complained of under Section 1983.

a.     *Defendants' Liability Under Section 1983*

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.  Although the statute itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  To prevail on a claim arising under Section 1983, a plaintiff must demonstrate:  "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law." *Hawkins v. Nassau Cty. Corr. Facility*, 781 F. Supp. 2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983).  The traditional definition of "acting under color of state law" requires that the defendant exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043 (1941).

1) The Town

The Court first concludes that Plaintiffs fail to establish municipal liability against the Town.  A municipality may not be held liable under Section 1983 on a *respondeat superior* theory of liability.  *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036 (1978); *see also Genovese v. Town of Southampton*, 921 F. Supp. 2d 8, 24 (E.D.N.Y. 2013) ("[A] municipal entity may only be held liable where the entity *itself* commits a wrong") (internal citation omitted).  Instead, to state a claim for municipal liability, a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Authority of New York & New Jersey*, 615 F.3d 129, 140 (2d Cir. 2010) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *see also Norton v.*

*Town of Islip*, 97 F. Supp. 3d 241, 264 (E.D.N.Y. 2015), *reconsideration denied*, No. 12-cv-4463, 2016 WL 264930 (E.D.N.Y. Jan. 21, 2016), *aff'd*, No. 16-cv-490, 2017 WL 440131 (2d Cir. Feb. 1, 2017) (citing *Monell*, 436 U.S. at 690-91, 98 S. Ct. 2018; *Lamont v. City of New York*, No. 12-cv-2478, 2014 WL 4829328, at *7 (E.D.N.Y. Sept. 29, 2014)). Further, municipal liability "is not an independent cause of action" but, rather, "is an extension of liability" that "requires an underlying constitutional violation." *Soto v. City of New York*, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015) (citing *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006)).

Although Section 1983 does not require application of a heightened pleading standard to allege municipal liability, a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678, 129 S. Ct. 1937 (alteration in original) (internal quotation and citations omitted); *see also Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S. Ct. 1160 (1993). Thus, Plaintiffs cannot simply allege the existence of a policy and/or custom without putting forth "facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (internal citation omitted).

A custom may be found if there is a formal policy endorsed by the municipality, where actions are taken by policymakers therein, or when there is "a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge" of policymakers. *See Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F.Supp.2d 408, 419 (S.D.N.Y. 2008). A policy or custom may also be

inferred from a municipality's failure to train its employees, thus displaying "a deliberate indifference to the constitutional rights of those within its jurisdiction." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (internal quotation and citation omitted).  "The Supreme Court has emphasized that a municipality's culpability for a deprivation of rights under § 1983 is at its most tenuous where a claim turns on a failure to train." *D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017) (citing *Connick v. Thompson*, 563 U.S. 51, 61-62, 131 S. Ct. 1350 (2011)) (internal quotations and brackets omitted).  Thus, "[t]o establish a failure to train claim, a plaintiff must generally demonstrate that there has been a pattern of similar constitutional violations by untrained employees." *Id.* (internal quotation omitted).  In addition, a municipality may be held liable when its employee is "acting as a final policymaker." *Hurdle v. Bd. of Educ. of City of New York*, 113 F. App'x 423, 425 (2d Cir. 2004) (internal quotation and citations omitted).  Under this theory,

> the official in question need not be a municipal policymaker for all purposes.  Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the municipality's business … or must have the power to make official policy *on a particular issue* … or must possess final authority to establish municipal policy *with respect to the action ordered*.

*Id.* (internal brackets, quotations, and citations omitted) (emphasis in original).

Here, the Complaint relies entirely on conclusory, boilerplate allegations in its attempt to establish municipal liability.  *See*, *e.g.*, Compl. ¶ 100 ("The Town staffed the [STPD] with officers who were unsupervised, undisciplined, inadequately trained

and wholly unsuited to perform as police officers."); *id*. ¶ 101 ("Kiernan, as sergeant, was in a supervisory position and knew or should have known that Lee had not committed any criminal act."); *id*. ¶ 103 ("The violation of constitutional rights is such a highly predictable consequence of failing to train its officers in the elements of the penal law that Lee … was accused of, show a deliberate indifference by the Town, the [STPD] and its policy makers for the need for more or better supervision and training of its officers …"); *id*. ¶ 131 ("The Town knew, or should have known, that staffing a municipality with employees, including … Kratoville and Scarlato, who were unsupervised, undisciplined, inadequately trained and wholly unsuited to perform their responsibilities, would pose a risk that other employees and/or licensees would be subject to conduct that was motivated by personal, economic, or political gain."); *id*. ¶ 134 ("The Town and the [STPD] knew, or should have known, that failing or refusing to take corrective measures against employees … would result in repeated incidents of violations of individual rights protected by the [C]onstitution, statutory and common law."); *id*. ¶ 154 ("The Town and the [STPD] failed to train their employees to know or look up the relevant sections of the N.Y. Penal Law sufficiently for them to recognize that in the case involving Lee and the Photograph, no probable cause existed …"); *id*. ¶ 179 ("Before Lee was detained, questioned, arrested and charged, the Town was aware of improper practices and customs, including routinely detaining individuals without probable cause … subjecting them to unlawful intimidation and interrogations … and seizing and searching their property without probable cause and without a warrant."); *see generally id*. ¶¶ 176-82.

The Complaint's lack of any factual allegations substantiating the assertion that *any* other individuals were subjected to similar treatment by the Southampton Defendants' renders Plaintiff's assertion of municipal liability deficient as no inference of a "custom or policy" is tenable. Specifically, with respect to any alleged "failure to train," there is no contention that there has been a pattern of similar conduct (or even one comparable event). Similarly, Plaintiffs' allegations concerning "policymakers" are conclusory. As to Kiernan – a sergeant with the STPD largely responsible for investigating and arresting Lee, *see* Compl. ¶¶ 11, 75, 95 – the contention that he was in a "supervisory position" is conclusory and, in any event, does not establish that he was a "policymaker." *See id*. ¶ 101 ("Kiernan … was in a supervisory position"). Accordingly, the Court concludes that Plaintiffs have failed to allege municipal liability, and respectfully recommend dismissing the Complaint as against the Town.[14]

### 2)   The Remaining Southampton Defendants

The Court also concludes that the Section 1983 causes of action against Kratoville, Kiernan, and Scarlato, who are sued herein solely in their official

---

[14] The one area that the Complaint might state a plausible claim for municipal liability is with respect to the termination of the License Agreement. Specifically, Plaintiffs allege that Scarlato, as Town Attorney, unilaterally issued a letter to Plaintiffs purporting to terminate the contract (although this decision needed to be ratified by the Town Board). *See* Compl. ¶¶ 104-106. Further, Plaintiffs contend that Kratoville and Scarlato, two of the three members on the Committee in charge of evaluating RFPs for the Golf Center, were in a position to interfere with the License Agreement. *See id*. ¶¶ 51, 215, 221. Nevertheless, Plaintiffs have withdrawn all contract-based claims against the Southampton Defendants, *see*, *e.g*., DE [21], and these allegations are insufficient to establish municipal liability with respect to the remaining causes of action against the Southampton Defendants. *See Hurdle*, 113 F. App'x at 425 (municipal liability can only be found on behalf of policymakers if they are "responsible under state law for making policy *in that area* of the municipality's business").

capacities, should be dismissed as duplicative of Plaintiffs' claims against the Town. *See, e.g., Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345 n. 35 (S.D.N.Y. 2012) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.") (collecting cases); *see also Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 284 (E.D.N.Y. 2010) ("Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources.") (internal quotation and citation omitted). Accordingly, the Court respectfully recommends dismissing the Section 1983 claims against Kratoville, Kiernan, and Scarlato.[15]

### 3)  Schultzel

Finally, the Court concludes that Plaintiffs have failed to establish that Schultzel was a state actor for the purposes of the Section 1983 malicious prosecution claim asserted against him.

"The conduct of private persons or entities, no matter how discriminatory or wrongful, generally does not constitute state action and therefore cannot form the basis of a Section 1983 claim." *Harrison v. New York*, 95 F. Supp. 3d 293, 322 (E.D.N.Y. 2015) (internal quotation and citations omitted). "However, state action may be found when there is such a close nexus between the State and the challenged

---

[15] For the sake of a complete record, however, the Court addresses Plaintiffs' substantive claims and concludes that they are without merit. *See* Section II(A)(b)-(e), *infra*.

action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* (citing *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 188 (2d Cir.2009) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S. Ct. 924 (2001)) (internal quotations omitted). "Such a nexus may exist where the private actor was a willful participant in joint activity with the State or its agents or where the private actor conspired with a state official to violate the plaintiff's constitutional rights." *Id.* (collecting cases) (internal quotation brackets omitted); *see also Bang v. Utopia Rest.*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996) ("a private citizen may be deemed to be a state actor when he is a 'willful participant in a joint action with the State or its agents.'") (quoting *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S. Ct. 183 (1980)). "To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guarantee by federal law." *Id.* (citing *Cunningham v. Southlake Center for Mental Health, Inc.,* 924 F.2d 106, 107–08 (7th Cir.1991)). "In other words, joint action with a state official can be found only if it is shown that the private individual acted in willful collaboration with a state actor to deprive the plaintiff of a federal right." *Harrison*, 95 F. Supp. 3d at 322 (internal quotation, citations, and brackets omitted). "Merely providing information to law enforcement, even if that information is false or mistaken, does not render the supplier of information a state actor…. A private party supplying information … does not become a state actor … unless the police officers were improperly influenced or controlled by the private party." *Stewart v.*

*Victoria's Secret Stores, LLC,* 851 F. Supp. 2d 442, 446 (E.D.N.Y. 2012) (internal quotation and citations omitted).   "Moreover, a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Harrison*, 95 F. Supp. 3d at 323 (collecting cases).

Here, the Complaint does not allege any that Schultzel acted in concert with law enforcement with respect to his malicious prosecution claim.   Indeed, the Complaint concedes that the STPD was unaware of Schultzel's allegedly nefarious intent.   *See* Compl. ¶ 172 ("Schultzel … maliciously and willfully concealed from Kiernan and the [STPD] that [his] true purpose in making the allegations against Lee was to cause the Town to terminate the License Agreement so that [he and Corcoran] could take over the management of [the Golf Center] for their own financial benefit.").   Although Plaintiffs do allege that Schultzel conspired with Kratoville and Scarlato to have Lee prosecuted such that the Town would have ostensible grounds to terminate the License Agreement, *see* Compl. ¶¶ 50-51, 53, 110-11, 215, neither of these Defendants played more than a negligible role in the criminal proceedings.[16] Instead, the Complaint merely alleges that Kratoville spoke to Pearce about the allegations and forwarded him the Statement to Pearce**,** *see id*. ¶¶ 57, 63 – there is no contention that Kratoville or Scarlato had any further involvement with the investigation, Arrest, or prosecution sufficient to establish a conspiracy and defeat

---

[16] To the extent these allegations support Plaintiffs' causes of action for tortious interference with contract and conspiracy to tortuously interfere with contract, the Court notes that these claims are asserted under New York State law, rather than Section 1983.

the motion to dismiss.  Accordingly, the Court recommends that the Section 1983 malicious prosecution claim against Schultzel should be dismissed.

### b.    *False Arrest*

Turning to the merits of the Complaint, the Court further concludes that Lee has failed to state a cause of action for false arrest, which is assessed under Section 1983 and New York State law by "substantially the same" standard.  *See*, *e.g.*, *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).  Under federal law, a claim "for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  "Accordingly, a plaintiff asserting such a claim must show some deprivation of liberty consistent with the concept of seizure." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Singer v. Fulton Cty. Sheriff*, 63 F.3d 100, 116 (2d Cir. 1995)).  Under Section 1983 and New York law, Lee must establish that "(1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified." *Levantino v. Skala*, 56 F. Supp. 3d 191, 200 (E.D.N.Y. 2014) (citing *Singer*, 63 F.3d at 118); *see also Harley v. City of New York*, No. 14-cv-5452, 2016 WL 552477, at *2 (E.D.N.Y. Feb. 10, 2016) ("The elements of a false arrest claim under Section 1983 are substantially the same as the elements under New York State law:  Plaintiff must show that the defendant intentionally

confined him without his consent and without justification.") (internal quotation omitted).

It is well-established that under Section 1983 and New York state law, "the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d at 151-52; *see also Davenport v. Cty. of Suffolk*, No. 99-cv-3088, 2007 WL 608125, at *5 (E.D.N.Y. Feb. 23, 2007) ("[P]robable cause as to any charge at the time of arrest is sufficient to defeat a false arrest claim as a matter of law."). Probable cause to arrest exists where an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). "To determine whether probable cause exists, [courts] look at the facts as the officers knew them in light of the specific elements of the offense … considering the totality of the circumstances and the perspective of a reasonable police officer in light of his training and experience." *Caravalho v. City of New York*, 732 F. App'x 18, 22 (2d Cir. 2018) (internal quotations and citations omitted).

To that end, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal citation omitted). Further, "probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in

relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453 (1983)).   The motivation of the arresting officers and municipal or other persons associated with an arrest, are "not a consideration in assessing probable cause." *Singer*, 63 F.3d at 119 (citing *Mozzochi v. Borden,* 959 F.2d 1174, 1179–80 (2d Cir.1992)).   Moreover, "[o]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.  Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).  In deciding a motion to dismiss, the "question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852.

With respect to the Unlawful Surveillance charge that Lee was ultimately arrested and prosecuted for, probable cause exists when "upon defendant's consent, the officer observed in plain view the screen of the camera showing a picture zoomed in between a girl's legs, displaying her undergarments." *People v. Zapata*, 41 A.D.3d 109, 110, 837 N.Y.S.2d 110 (1st Dep't 2007) (citing *People v. Polanco*, 292 A.D.2d 29, 34, 740 N.Y.S.2d 35 (1st Dep't 2002); *People v. Ochoa*, 263 A.D.2d 359, 362, 692 N.Y.S.2d 388 (1st Dep't 1999)).  Moreover, the "seizure of [a] camera to prevent defendant from deleting any … photographs [is] incidental to defendant's arrest and proper." *Id.* (citing *People v. Webb*, 291 A.D.2d 319, 320 737 N.Y.S.2d 618 (1st Dep't 2002)).  As for the statute's prohibition against someone "surreptitiously" taking a

photograph of a person's "sexual or other intimate parts" without their knowledge, the New York Court of Appeals has recognized that surreptitious conduct "requires that the perpetrator make an effort to conceal his [actions] or to escape detection…. [I]t is not necessary that the conduct be entirely imperceptible to all members of the general public.  Rather, whether a defendant's actions can be considered surreptitious is dependent on the particular facts and circumstance presented." *People v. Schreier,* 22 N.Y.3d 494, 498, 982 N.Y.S.2d 822 (2014) (citing Merriam–Webster's Collegiate Dictionary [11th ed. 2003] defining "surreptitiously" as something done "by stealth" or "clandestinely").  In addition, the statute defines "sexual or other intimate parts" as "human male or female genitals, pubic area or buttocks … *and shall include such part or parts which are covered only by an undergarment.*"  *See* N.Y. Penal Law § 250.40(3) (emphasis added).

Here, the Court first notes that Plaintiffs do not differentiate between the October 15, 2015 questioning and October 21, 2015 Arrest in arguing that they have stated a claim for false arrest.  *See generally* Pltfs.' SH Mem. at 13-17.  Instead, they argue that the lack of probable cause at any time rendered the relevant events summarily unlawful.  *See id.*  The Court disagrees.

Starting with the events of October 15, 2015, the Court finds that probable cause to arrest Lee existed before he was ever taken to STPD headquarters, such that his transport would have been justified inasmuch as it constitutes intentional confinement without consent.  In reaching this conclusion, the Court notes that the

face of the Complaint fails to plausibly allege a lack of probable cause and the Criminal File removes any doubt as to its existence.

Looking first at the Complaint, Plaintiffs allege that prior to visiting Lee at the Golf Center on October 15, 2015, the STPD possessed Schultzel's Statement claiming that Lee had taken an inappropriate Photograph of an underage girl from inside his office through a two-way mirror. *See* Compl. ¶¶ 63-64. Although Plaintiffs contend that Schultzel and Kratoville had conspired to initiate the investigation of Lee to justify terminating the License Agreement, *see* Compl. ¶¶ 50, 110, there is no allegation that anyone in the STPD was aware these motives. Thus, the STPD had no reason to doubt the truth of Schultzel's, an eyewitness, accusation.[17] *See Panetta*, 460 F.3d at 395 (law enforcement has probable cause if they receive information from an eyewitness and have no reason to doubt the person's veracity); *Bernard*, 25 F.3d at 102 (probable cause can exist even where it is based on mistaken information if the arresting officer relies on that information in good faith).

Moreover, Plaintiffs' implication in the Complaint and contention in their brief that the STPD acted *solely* on the "false" information provided by Schultzel lacks merit. *See* Compl. ¶¶ 62-65; Pltfs.' SH Mem. at 15 (The STPD did not have "even an iota of trustworthy information that the Photograph was taken surreptitiously. The Town's assertion that [Kiernan] did is based entirely on the misrepresentation

---

[17] Plaintiffs' argument that Schultzel's Statement should not have been relied on because it was written by Hurt, *see* Pltfs.' Second Mem. at 14, is rejected. Hurt merely composed the Statement for Schultzel, who then reviewed its contents before signing it and sharing it with Kratoville. *See* Compl. ¶¶ 59-63; Pltfs.' SH Mem. at 15 (the Statement "was [only] signed by Schultzel"). There is no allegation that Hurt purported to be a witness himself, but, rather, that he articulated Schultzel's account.

[contained in the Statement]").  Indeed, additional witnesses relayed nearly identical information as the Statement.  *See* Corroborating Depositions.[18]  Haining and Matheson are not referenced in the Complaint and, in turn are not alleged to have given the STPD a reason to doubt the truth of their statements.  In any event, assuming *arguendo* that Kiernan and the STPD were aware of, or even in support of, the plan to terminate the License Agreement, such motivation would have no bearing on whether probable cause existed.  *See Singer*, 63 F.3d at 119 (the motive of the arresting officers is not a consideration in assessing the existence of probable cause). Moreover, Plaintiffs concede that at least some investigation occurred before Lee was ever brought to the police station.  Indeed, the Complaint alleges that STPD officers visited the Golf Center, spoke to Lee for "several minutes," and observed the Window before bringing him to headquarters for questioning.  *See id.* ¶¶ 67-69; *see also* Pltfs.' SH Mem. at 15 ("Kiernan and the STPD had opportunity to observe the transparent window, and to observe the Photograph").  Thus, Plaintiffs' assertion that "[n]o investigation was done … to determine whether the element of 'surreptitious' was met," *see* Pltfs.' SH Mem. at 16, is without merit.

Further, Plaintiffs' argument that Schultzel's mischaracterization of the Window as a two-way mirror, as opposed to transparent, renders the ensuing events summarily lacking in probable cause is rejected for multiple reasons.  *See* Pltfs.' SH Mem. at 14-15.  Initially, the Court finds that given the undisputed facts and

---

[18] The Matheson Deposition was sworn to on September 30, 2015, two weeks before officers visited the Golf Center.  It is unclear whether the Haining Deposition, dated October 15, 2015, occurred before or after Lee was questioned.

circumstances of this case, the exact characteristics of the Window are immaterial for the purposes of probable cause to arrest.   Indeed, Lee admits that he took the Photograph of the young girl through the Window, while he was inside and she was outside looking at her phone (*i.e.*, without knowledge that she was being observed). *See* Compl. ¶ 38.   Thus, assuming *arguendo* that the Window was completely transparent, Lee nevertheless took the Photograph in a stealth manner because he was imperceptible to the young girl at the time he captured the picture, rendering it irrelevant whether someone outside could have seen him if they looked inside. *See Schreier,* 22 N.Y.3d 494, 498, 982 N.Y.S.2d 822 (whether a photograph was taken surreptitiously requires consideration of the particular facts and circumstances presented and is not necessarily dependent on whether one is entirely imperceptible to all members of the general public).

Thus, as matter of law, it was reasonable for the investigating officers to have either:  (i) perceived the Window as a two-way mirror rendering the taking of the Photograph unquestionably surreptitious; or (ii) observed the Window as somewhere on the spectrum between transparent and opaque and concluded nonetheless that capturing the image of an unsuspecting child from inside constituted surreptitious conduct.  Either way, probable cause existed as a matter of law regardless of whether a trier of fact would ultimately determine that the crime of Unlawful Surveillance had been committed.  *See Caravalho*, 732 F. App'x at 22 (To determine whether probable cause exists, [courts] look at the facts as the officers knew them in light of the specific elements of the offense … considering the totality of the circumstances

and the perspective of a reasonable police officer in light of his training and experience."); *Krause*, 887 F.2d at 372 ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those *suspected of wrongdoing*, and not to finally determine guilt through a weighing of the evidence.") (emphasis added). Accordingly, there was probable cause to arrest Lee for Unlawful Surveillance before he was ever taken to the police station for questioning.

Lee's allegations that he was subsequently interrogated without being given his *Miranda* warnings and that his Phone was unlawfully searched, *see* Compl. ¶¶ 71, 147, do not impact the Court's analysis with respect to probable cause. Notably, despite making these allegations in the Complaint, Plaintiffs' opposition to the Southampton Defendants' motion to dismiss advances no arguments concerning whether this purported conduct alters the probable cause inquiry. *See generally* Pltfs.' SH Mem. Further, *Miranda* "violations are … properly redressed by the exclusion of improperly obtained evidence at trial; and not by way of an action pursuant to Section 1983." *Myers v. Cty. of Nassau*, 825 F. Supp. 2d 359, 368 (E.D.N.Y. 2011); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("plaintiffs cannot base a § 1983 claim solely on a law enforcement officer's failure to administer *Miranda* warnings") (internal citation omitted).

Notwithstanding the foregoing, the Court briefly addresses these allegations for the sake of a complete record. With respect to the *Miranda* warnings, the Advice of Rights Form, which Lee does not dispute signing, demonstrates that he understood

and waived his rights to remain free from self-incrimination and to counsel.  *See* Advice of Rights Form; *see Governara*, 2014 WL 4476534, at *2 ("Where a complaint's allegations contradict the terms of documents incorporated by reference, the documents control and [courts] need not accept as true the allegations in a complaint.").  To the extent that Lee implies that he signed the Advice of Rights Form under duress, his reliance solely on conclusory allegations renders such an argument implausible.  Specifically, Lee alleges that he was subject to "unconstitutionally impermissible tactics [and] psychological intimidation," *see* Compl. ¶ 72, without any explanation or substantiation.  He further claims that he was "told" to sign the Advice of Rights form but not that he was coerced to do so.  *See id*. ¶ 78.  As for the Consent to Search Form for the Phone, also indisputably signed by Lee, Plaintiffs offer no explanation as to why this document might have been signed under unlawful pretenses.  Accordingly, the Complaint is devoid of any plausible allegations that the Lee was arrested as a result of any unlawful interrogation or search tactics.

Turning to the actual Arrest on October 21, 2015, the Court similarly concludes that probable cause defeats the cause of action.  Building on the information that the STPD had after the events on October 15, 2015 – including multiple sworn witness statements, a police visit to the Golf Center, and an admission by Lee that he took the Photograph from inside his office – the officers then had six days to review the Photograph before determining that Lee's conduct was worthy of the Arrest.  *See* Compl. ¶ 94.  Having reviewed the Photograph, the Court similarly concludes that the image shows a girl's crotch and part of her buttocks, a portion of which are covered

only by underwear.  In other words, the Photograph depicts what the statute defines as "sexual or intimate parts," *i.e.*, "the … female … pubic area or buttocks … covered only by an undergarment."  *See* N.Y. Penal Law § 250.40(3).  Plaintiffs' contention that "the Photograph … depicted *nothing more* than a person sitting on a public bench wearing shorts, with the knee bent," *see* Pltfs.' SH Mem. at 15 (emphasis added), is disingenuous.  Accordingly, the Arrest was supported by probable cause and the Court respectfully recommends dismissing Plaintiffs' cause of action for false arrest pursuant to Section 1983 and New York State law.[19]

### c.   Malicious Prosecution

The Court further recommends dismissing Plaintiffs' causes of action for malicious prosecution against both the Southampton Defendants and Schultzel pursuant to both Section 1983 and New York State law.[20]

### 1)   The Southampton Defendants

Like false arrest, a claim for malicious prosecution pursuant to Section 1983 is governed by the same standard applicable under New York State law.  *See Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995).  To state a cause of action for malicious prosecution the plaintiff must allege: "(1) the commencement or

---

[19] Plaintiffs' argument that there was not probable cause for the Child Endangerment charge, *see* Pltfs.' SH Mem. at 15, similarly fails as a matter of law in light of probable cause existing for Unlawful Surveillance.  *See Jaegly*, 439 F.3d at 153-54 (2d Cir. 2006) ("a claim for false arrest turns only on whether probable cause existed to arrest a defendant[.] … [I]t is not relevant whether probable cause existed with respect to each individual charge…. Stated differently, when faced with a claim for false arrest, [courts] focus on the validity of the *arrest*, and not the validity of each charge.") (emphasis in original).

[20] Although it has no bearing on the Court's analysis, the malicious prosecution claim against Schultzel is evaluated only under New York law, as he is not a state actor.  *See* Section II(ii)(a)(3), *supra*.

continuation of a criminal proceeding by the defendant against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice." *Anderson v. Cty. of Nassau*, 297 F. Supp. 2d 540, 546 (E.D.N.Y. 2004) (citing *Riccuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Here, with respect to the Southampton Defendants, there is no dispute that a criminal proceeding was commenced against Lee and that it ended in his favor when he was acquitted on his Unlawful Surveillance charge after a jury trial. *See* Compl. ¶¶ 118-19. Thus, the claim against them centers on whether there was probable cause to prosecute Lee for Unlawful Surveillance and whether they acted with actual malice.

As with claims for false arrest, "[t]he existence of probable cause is an absolute defense to a cause of action for malicious prosecution." *Maron v. Cty. of Albany*, 166 Fed. App'x 540, 541 (2d Cir. 2011). "For purposes of the tort of malicious prosecution, probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of or whether a discreet and prudent person would be led to the belief that a crime had been committed by the person charged." *Gilman v. Marsh & McLennan Companies, Inc.*, 868 F. Supp. 2d 118, 129–30 (S.D.N.Y. 2012), *aff'd*, 654 F. App'x 16 (2d Cir. 2016) (citing *Silver v. Kuehbeck,* No. 05-cv-35, 2005 WL 2990642, at *19 (S.D.N.Y. Nov. 7, 2005)) (internal quotations omitted). "The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the [prosecutors]

at that time." *Id.*  Thus, "[t]he existence of probable cause at the time of arrest ... may not be dispositive of the issue as to the malicious prosecution claim, because ... evidence could later surface which would eliminate that probable cause." *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545, 562 (E.D.N.Y. 2011); *see also Gaston v. City of New York*, 851 F. Supp. 2d 780, 793 (S.D.N.Y. 2012) ("The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, 'except that [a claim for malicious prosecution] must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest.'") (quoting *Danielak v. City of New York*, 02-cv-2349, 2005 WL 2347095, at *10 (E.D.N.Y. Sept. 26, 2005)).   Nevertheless, "in the absence of exculpatory facts which became known after an arrest, probable cause to arrest is a complete defense to a claim of malicious prosecution."  *D'Angelo v. Kirschner*, 288 Fed. App'x 724, 726 (2d Cir. 2008).

"Where, as here, a grand jury indicted the plaintiff on the relevant criminal charge, New York law creates a presumption of probable cause [to prosecute]." *Debrosse v. City of New York*, 739 F. App'x 48, 50 (2d Cir. 2018) (citing *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (internal quotation omitted)).[21] "In assessing the probable cause element of a malicious prosecution claim under New York law, courts 'may not weigh the evidence upon which the police acted or which

---

[21] Conversely, a grand jury indictment does not create a presumption that there was probable cause to arrest.  *See Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) ("the New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment 'applies only in causes of action for malicious prosecution and is totally misplaced when applied in false arrest actions.'") (quoting " *Broughton v. State,* 37 N.Y. 2d 451, 456, 373 N.Y.S.2d 87 (1975)) (internal brackets omitted).

was before the Grand Jury after the indictment has issued.'" *Id.* (quoting *Colon*, 60 N.Y.2d at 83, 468 N.Y.S.2d 453).  "Instead, the presumption of probable cause 'can only be overcome by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith.'") *Id.* (quoting *Bermudez*, 790 F.3d at 377).

Applying these standards, the Court concludes that the Complaint fails to state a claim for malicious prosecution for many of the same reasons that the false arrest cause of action is without merit.  Namely, as discussed above, there was probable cause for Lee's Arrest and there is no plausible allegation that any exculpatory facts subsequently came to light.  Similarly, there are no plausible allegations that the Indictment was secured by fraud, perjury, the suppression of evidence, or bad faith conduct such that the presumption of probable cause can be overcome.

The Court first concludes that there was a reasonable basis to charge Lee with Unlawful Surveillance.  As discussed above, there is no dispute that Lee took the Photograph from inside his office, through the Window, of the young girl outside looking at her cellphone.  Moreover, the Photograph, which the Grand Jury reviewed before returning the Indictment, *see* Schultzel GJ Transcript at 17-18, shows the child's pubic area and buttocks, a portion of which are covered only by her underwear. Accordingly, a presumption of probable cause has been established.

With respect to any alleged impropriety before the Grand Jury, Plaintiffs' argument that that the Indictment was a product of perjury because Schultzel "knowingly testified falsely before the Grand Jury that the window through which

Lee had taken the Photograph was a one-way mirrored window," *see* Compl. ¶ 108, is conclusively disproven by the applicable record. *See* Schultzel GJ Transcript at 15:15-16:1 (testifying that the Window was tinted as opposed to mirrored); *see also Governara*, 2014 WL 4476534, at *2 ("Where a complaint's allegations contradict the terms of documents incorporated by reference, the documents control and [courts] need not accept as true the allegations in a complaint.") (internal quotations, citations, and brackets omitted).[22]  Absent this assertion, the Complaint is devoid of any factual support that the Indictment was the product of fraud, perjury, the suppression of evidence, or other bad faith conduct.[23]  Accordingly, Plaintiffs have failed to overcome the presumption of probable cause created by the Indictment, rendering his malicious prosecution claim against the Southampton Defendants deficient as a matter of law.

The Court further notes that the Complaint also fails to adequately allege actual malice.  As for this element, New York law requires "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg,* 44 N.Y.2d 500, 502–03, 406 N.Y.S. 2d 443 (1978)).  In this regard, the Court rejects Plaintiffs' the unsubstantiated argument that that "the Complaint alleges numerous

---

[22] Insofar as Schultzel misrepresented the nature of the Window in his Statement leading to the *Arrest*, there is no allegation that a similar description was relied upon by the Grand Jury.

[23] In this regard, Plaintiffs' allegation that "[t]he testimony presented by Kiernan before the Grand Jury that indicted Lee was false and misleading," *see* Compl. ¶ 161, is conclusory and unsubstantiated.

facts showing an improper motive [by the Southampton Defendants] to commence the criminal proceedings." *See* Pltfs.' SH Mem. at 19. Initially, the Court reiterates that this cause of action is directed only at the Town, the STPD, Kiernan, and Doe, while the Complaint only alleges that *Kratoville and Scarlato*, who are not alleged to have participated in the prosecution, had ulterior motives. Thus, there is no assertion that the relevant Defendants acted with actual malice.

In any event, the Complaint's allegations that any Southampton Defendants were motivated by their desire to terminate the License Agreement, rather than to see the ends of justice served, in prosecuting Lee is implausible under the facts as alleged. To that end, the Complaint claims, in conclusory fashion, that the Southampton Defendants were acting for their own financial and political benefit. *See*, *e.g.*, Compl. ¶ 129 (The Southampton Defendants acted "in pursuit of personal, economic or political goals"); *id*. ¶ 132 ("The [Southampton Defendants] have engaged in a campaign of harassment against Lee at the direction of Kratoville and Scarlato … for [their] own financial and/or political benefit"). Plaintiffs do not explain how any of the Southampton Defendants stood to receive any benefit from terminating the License Agreement with SLG in favor of a new license. Indeed, the Town was receiving an annual fee from SLG, and by terminating the License Agreement it was no longer entitled to those funds, reflecting a financial detriment. Insofar as the Town eventually awarded a new contract for the operation of the Golf Center to Pin High, Plaintiffs do not allege that the annual fee associated therewith was greater than what SLG was paying. *See* Compl. ¶ 120.

Plaintiffs similarly fail to substantiate what personal gain Kratoville or Scarlato might have realized by terminating the License Agreement and approving a new manager of the Golf Center. Moreover, the Complaint does not to allege that either of these Defendants had any involvement in Lee's Arrest or prosecution after Kratoville forwarded the Statement to Pearce. In short, there is no plausible allegation that the Southampton Defendants were seeking anything other than justice in prosecuting Lee for his conduct. Accordingly, the Court respectfully recommends dismissing Lee's malicious prosecution cause of action against the Southampton Defendants.

### 2) Schultzel

With respect to claims against private citizens, such as Schultzel, "[b]ecause accusers must be allowed room for benign misjudgments, the New York Court of Appeals has held that the law places a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (citing *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195, 712 N.Y.S.2d 438 (2000) (internal quotations omitted). Nevertheless, the cause of action requires proof of the same essential elements as against law enforcement. *See id*. As discussed above, Lee's prosecution was supported by probable cause and it is undisputed that the criminal proceedings were resolved in his favor. *See* Section II(A)(ii)(c)(1), *supra*. Thus, as to Schultzel, the dispute centers on whether he commenced the criminal proceedings against Lee and whether he acted with malice.

As for this the element of initiating the prosecution, "New York law imposes a presumption that a prosecutor exercises his own independent judgment in deciding to prosecute a criminal defendant." *Gilman*, 868 F. Supp. 2d at 128 (internal citations omitted). Thus,

> [g]enerally, a civilian defendant who merely furnishes information to law enforcement authorities who are then free to exercise their own independent judgment as to whether an arrest will be made and criminal charges filed will not be held liable for malicious prosecution.... The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition.... At the motion to dismiss stage, New York law requires a plaintiff to plead intentional or knowing conduct on the part of a defendant, including misrepresentations, falsification or omission of evidence to the grand jury or district attorney.

*Delince v. City of New York*, No. 10-cv-4323, 2011 WL 666347, at *5 (S.D.N.Y. Feb. 7, 2011) (quoting *Lupski v. Cty. of Nassau*, 32 A.D.3d 997, 998-99, 822 N.Y.S.2d 112 (2d Dep't 2006) (internal quotations omitted). "However, a person who does not file a complaint may be found to have initiated a proceeding for malicious prosecution purposes where that person induces or persuades a prosecutor to act." *Gilman*, 868 F. Supp. 2d at 128 (quoting *Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.,* No. 99-cv-4677, 2004 WL 2290499, at *5, n. 8 (S.D.N.Y. Oct. 8, 2004) (internal quotation omitted)). "This usually arises in situations where the person has induced prosecution by providing false information to the authorities, knowingly withholding highly material information, or convincing a person to file a complaint who would not otherwise have done so." *Id.* (internal quotation and brackets omitted).

Here, the Complaint fails to establish that Schultzel commenced criminal proceedings against Lee.   At most, Schultzel furnished information to law enforcement that led to the investigation of Lee and his ultimate Arrest and prosecution based on the authorities' own judgment.[24]   Thus, even assuming *arguendo* that Schultzel intentionally misrepresented the characteristics of the Window in the Statement, he still did not, as a matter of law, initiate the criminal proceedings.   To that end, Plaintiffs concede that Kiernan performed his own investigation that involved, among other things, observing the Window and reviewing the Photograph prior to arresting, let alone prosecuting, Lee.  *See* Compl. ¶¶ 68, 73, 94; *see also* Pltfs.' SH Mem. at 6 ("The arrest took place six days after the STPD seized Lee's [Phone], providing Kiernan and the STPD six days in which to study the Photograph and to consider whether there was evidence of any crime having been committed…."); *cf. Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 348 (S.D.N.Y. 2000) ("it is clear that the police, having received the report of possible unauthorized credit card activity, conducted their own investigation and reached their own independent conclusions…. They were acting in response to a report, true, but no one was forcing them to act.  Indeed, the police are under no independent duty to act in response to private complaints – they acted of their own volition."). In addition, multiple other witnesses had corroborated Schultzel's account, including his description of the Window, prior to the Arrest. *See* Corroborating Depositions.  Moreover, as discussed

---

[24] Indeed, the Complaint does not allege that Schultzel ever conferred with Kiernan or STPD prior to their investigation of Lee.   Instead, Plaintiffs contend that Schultzel provided *Kratoville* with the Statement, who merely forwarded it to law enforcement.  *See* Compl. ¶¶ 60, 63,

above, it was reasonable to conclude that Lee had committed the crime of Unlawful Surveillance regardless of the Window's composition, *see* Section II(A)(ii)(b), *supra*, meaning the initial mischaracterization of it as a mirror was not "highly material." *See Gilman*, 868 F. Supp. 2d at 128. Accordingly, there were multiple factors aside from Schultzel's Statement that led to the commencement of the criminal proceedings against Lee, and the Court respectfully recommends dismissing the malicious prosecution cause of action as against him.[25]

### d.     Violation of Lee's Liberty Interest

The Court further concludes that Lee has failed to state a claim against the Southampton Defendants for "violating Lee's liberty interest under the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983." *See* Compl. ¶¶ 186-92. In this regard, Lee argues that he has stated a cognizable "stigma-plus" claim because the Southampton Defendants' conduct "stigmatized [his] reputation as a PGA professional to such an extent that he has been unable to secure employment in the golf business since he was first charged." *See* Pltfs.' SH Mem. at 22-25. The Court disagrees.

"A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under

---

[25] Assuming *arguendo* that the Complaint plausibly alleges that Schultzel acted with actual malice because he was motivated to replace SLG as the Golf Center's licensee, *see* Compl. ¶¶ 50, 110, 112, 133, the claim still fails as a matter of law because there was probable cause and he did not, as a matter of law, commence the criminal proceedings.

§ 1983." *Patterson*, 370 F.3d at 329–30 (citing *Paul v. Davis,* 424 U.S. 693, 701, 96 S. Ct. 1155 (1976); *Morris v. Lindau,* 196 F.3d 102, 114 (2d Cir.1999)). "Instead, when dealing with loss of reputation alone, a state law defamation action for damages is the appropriate means of vindicating that loss." *Id.*[26] "Loss of ones' reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 330 (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572-73, 92 S. Ct. 2701 (1972); *Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994)). "For a *government employee*, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the dismissal from government employment…. This type of claim is commonly referred to as a 'stigma-plus' claim." *Id.* (citing *Roth,* 408 U.S. at 573, 92 S. Ct. 2701; *Morris,* 196 F.3d at 114) (emphasis added); *see also DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) ("'Stigma-plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process.") (citing *Paul,* 424 U.S. at 701-02, 96 S. Ct. 1155; *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989)).

"To prevail on a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v.*

---

[26] The Complaint does not contain any defamation claims.

*City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (citing *Doe v. Dep't of Pub. Safety ex rel.*
*Lee,* 271 F.3d 38, 47 (2d Cir.2001) (citing *Paul,* 424 U.S. at 701–02, 710–11, 96 S. Ct.
1155), *rev'd on other grounds sub nom.*, 538 U.S. 1, 6–7, 123 S. Ct. 1160 (2003)).  The
second element "fails … [when plaintiffs] allege only damage to professional and
personal reputation and resulting loss of business, [which are] injuries that may
support state tort claims but not a constitutional action." *Autotech Collision Inc. v.*
*The Inc. Vill. of Rockville Ctr.*, 673 F. App'x 71, 74 (2d Cir. 2016) (citing *Sadallah*,
383 F.3d at 38) (rejecting the plaintiffs' stigma-plus claims alleging that the
defendants acts had caused the plaintiffs damage to their business reputation and
the deprivation of goodwill because the harms were not "in addition to" the alleged
defamation, "but rather [were] direct 'deleterious effects' of that defamation")
(internal citation omitted)).

Here, Lee fails to state "stigma-plus" claim as a matter of law.  Assuming that
the Complaint adequately alleges that the Southampton Defendants engaged in the
requisite defamatory conduct to satisfy the first element, the failure to assert a state-
imposed burden or alteration of status or rights renders the cause of action fatally
flawed.  Initially, Lee concedes that he was never "employed" by the government, and
instead merely alleges that his company, SLG, contracted with the Town *via* the
License Agreement (which the Town ultimately terminated) to operate, maintain,
and manage the Golf Center. *See* Compl. ¶ 23.  Thus, Plaintiffs' argument that the
"second prong was met when the Town Officials altered [his] status by terminating
his employment with the Town and assuring that his career as a PGA golf pro was

ended," *see* Pltfs.' SH Mem. at 24, misses the mark.  Specifically, the lack of a viable allegation of government employment or a deprivation of other rights afforded by the state renders his claim deficient.  *See Patterson*, 370 F.3d at 330.[27]  Accordingly, the Court respectfully recommends dismissing Lee's cause of action for a "stigma-plus" violation of his liberty interest against the Southampton Defendants.

### e.    *Deprivation of Civil Rights Under Section 1983*

Turning to Lee's purported "deprivation of civil rights" claim against the Town and Kiernan, the Court notes that the Complaint does not allege that any additional civil rights violations, other than those addressed in other causes of action, occurred.  Instead, Plaintiffs attempt to assert municipal liability as its own cognizable right to relief.  *See* Compl. ¶¶ 176-85.  As discussed above, however, municipal liability is not its own cause of action and Plaintiffs otherwise failed to allege liability should be extended to the Town.  *See* Section II(A)(ii)(a)(1), *supra*.  Accordingly, the Court respectfully recommends dismissing this "cause of action."

### f.    *Remaining Tort Claims*

Finally, the Court respectfully recommends dismissing Plaintiffs' contract-based tort claims against Schultzel without prejudice.  Initially the Court notes that Plaintiffs have withdrawn their contract-related claims against the Southampton Defendants.  *See* Plaintiffs' July 5, 2018 Letter to the Court, DE [21], at 3; *see also*

---

[27] Plaintiffs' reliance on *Patterson* for the proposition that a "stigma-plus" claim is established because Lee's "good name, reputation, honor, or integrity" has been questioned, *see* Pltfs.' Second Mem. at 24, is misguided because their citation omits the essential factor that this only occurs for a "claim arising from the termination of government employment."  370 F.3d at 330.  Similarly, Plaintiffs' reliance on *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996), is without merit because that case also concerned the termination of a municipal employee.

Pltfs.' SH Mem. at 7 ("on July 5, 2018, Plaintiffs withdrew [their contract-related] causes of action against the [Southampton Defendants]").   Accordingly, all that remains in this regard are Plaintiffs' tortious interference with contract, and conspiracy to tortuously interfere with contract causes of action as against Schultzel (together, the "Tort Claims").[28]  The Court respectfully recommends dismissing these claims without prejudice because the exercise of supplemental jurisdiction at this stage in the proceedings is unwarranted.

Regardless of whether the Tort Claims have merit, the Court, having concluded that Plaintiffs' federal claims and their state analogs should be dismissed with prejudice, further recommends declining to exercise supplemental jurisdiction over these causes of action.  *See Quiroz v. U.S. Bank Nat'l Ass'n*, No. 10-cv-2485, 2011 WL 2471733, at *8 (E.D.N.Y. May 16, 2011) (recommending that the district court decline to exercise supplemental jurisdiction after all federal claims were dismissed) *report and recommendation adopted*, 2011 WL 3471497 (E.D.N.Y. Aug. 5, 2011). Supplemental jurisdiction is governed by 28 U.S.C. § 1367, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . " 28 U.S.C. § 1367(a).  The court may, however, "decline to exercise supplemental jurisdiction if it has dismissed all claims over which is has original jurisdiction." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d

---

[28] The breach of contract claim was only asserted against the Town. *See* Compl. ¶¶ 199-208.

Cir. 2006) (citing 28 U.S.C. § 1367(c)(3)) (internal quotations omitted).  To that end, "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."  *Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) (internal citation omitted).  Accordingly, the Court respectfully recommends declining to exercise supplemental jurisdiction over the Tort Claims and dismissing them without prejudice.

## B.   **Motion for Sanctions**

The Court further recommends denying Schultzel's motion for sanctions both because:  (i) it is procedurally improper due to a deficient safe harbor notice; and (ii) Plaintiffs' conduct does not warrant sanctions.

### i.   Legal Standard

Federal Rule of Civil Procedure 11 provides, in relevant part:

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances … the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery ….

Fed. R. Civ. P. 11(b)(3).  Further, Rule 11 states that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction …." Fed. R. Civ. P. 11(c)(1). It is well-settled, however, that "sanctions should issue only in extraordinary circumstances …." *Graves v. Deutsche Bank Sec. Inc.*, No. 07-cv-5471, 2010 WL 997178, at *7 (S.D.N.Y. Mar. 18, 2010) (internal quotation omitted); *see also Storey v.*

*Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d Cir. 2003) ("[S]anctions may not be imposed unless a particular allegation is utterly lacking in support."); *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1005 (2d Cir. 1988) (Rule 11 sanctions are "targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced…") (internal quotation and citation omitted); *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986) ("Rule 11 is violated only when it is patently clear that a claim has absolutely no chance of success."). Ultimately, "[t]he imposition of sanctions by the court and the determination of the amount of the sanction is left to the court's discretion." *Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*, No. 05-cv-3826, 2009 WL 2242331, at *10 (E.D.N.Y. July 27, 2009); *see also Lorber v. Winston*, 993 F. Supp. 2d 250, 253 (E.D.N.Y. 2014) ("[E]ven where a court determines that Rule 11(b) has been violated, the decision whether to impose sanctions is not mandatory, but rather is a matter for the court's discretion.").

Because sanctions should only be issued in extraordinary situations, the Rules require a party seeking such relief to afford their adversary "safe harbor" prior to making a motion. Thus, at least 21 days in advance of filing the motion, a copy must be served on the accused party. *See* Fed. R. Civ. P. 11(c)(2). This safe harbor notice "must describe *the specific conduct* that allegedly violates Rule 11(b)." *Id.* (emphasis added); *see also Hart v. Crab Addison, Inc.*, No. 13-cv-6458, 2017 WL 726873, at *6 (W.D.N.Y. Feb. 24, 2017) ("The required specificity should include, at the very least … an identification of the particular statement [complained of]"). If the safe harbor

notice does not identify the specific representation complained of, the motion for sanctions must be denied. *See StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 310 (2d Cir. 2014) (vacating sanctions award, noting that "[o]nly conduct explicitly referred to in the instrument providing notice is sanctionable.") (internal quotation and citation omitted); *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999) ("Due process requires that courts provide notice and an opportunity to be heard before imposing *any* kind of sanctions…. At a minimum, the notice requirement mandates that the subject of a sanctions motion be informed of … the specific conduct … for which the sanctions are being considered.") (internal quotations, citations, and brackets omitted) (emphasis in original); *Estate of Raymond Thomas v. Cigna Grp. Ins.*, No. 09-cv-5029, 2016 WL 7235718, at *10 (E.D.N.Y. Dec. 13, 2016) ("general allegations," such as a plaintiff refusing to dismiss a claim, "do not adequately describe the specific conduct which allegedly merits sanctions.").

In considering a motion for sanctions – assuming adequate safe harbor notice was provided – courts evaluate the objective reasonableness of the pleading's allegations at the time it was signed. *See Asbeka Indus. v. Travelers Indem. Co.*, 831 F. Supp. 74, 90 (E.D.N.Y. 1993); *see also Dennis v. Pan Am. World Airways, Inc.*, 746 F. Supp. 288, 292 (E.D.N.Y. 1990) ("The duty to conduct a reasonable pre-filing inquiry into the law does not require that the signer ultimately be proved correct in his view of the law."); *Oliveri*, 803 F.2d at 1274 ("the signer's conduct is to be judged as of the time the pleading or other paper is signed.").  In determining whether to impose sanctions, "the court resolves all doubts in favor of the non-movant." *Simms*

*v. Biondo*, 158 F.R.D. 247, 249 (E.D.N.Y. 1994); *see Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150, 163 (E.D.N.Y. 2006) ("[W]hen divining the point at which an argument turns from merely losing to losing and sanctionable, courts must resolve all doubts in favor of the signer of the pleading.") (internal quotation and alterations omitted).

ii.   <u>Analysis</u>

Applying these standards, the Court concludes that sanctions are unwarranted both because Schultzel's safe harbor notice was devoid of the requisite specificity and because the Complaint's allegations against him, although meritless, are not frivolous.

a.   *Safe Harbor*

On November 16, 2018, more than six months prior to filing the instant motion, Schultzel provided notice of his intent to seek sanctions against Plaintiffs and their counsel if they refused to withdraw their "objectively frivolous" malicious prosecution claim against him. *See* DE [57-2] (the "Safe Harbor Notice"). Thus, more than 21-days' notice was given. The Safe Harbor Notice – largely mirroring the arguments set forth in Schultzel's motion to dismiss – however, fails to delineate any specific sanctionable allegations in the Complaint. *See generally id*. Instead, Schultzel merely contends that "[f]or the reasons set forth in [his] … letter requesting a pre-motion conference [to move to dismiss the Complaint], Mr. Lee's claim for Malicious Prosecution is frivolous," and, generally, that Plaintiffs' inaccurately asserted that Schultzel gave false testimony to the Grand Jury. *See id*. at 1-2. The Safe Harbor Notice then goes on to reiterate why Schultzel believes that cause of action is

meritless, without reference to a single paragraph of the Complaint directed at Schultzel. *See id.* at 2.

The motion now before the Court, however, largely focuses on two specific allegations in the Complaint: (i) Paragraph 108, asserting that "Schultzel knowingly testified before the Grand Jury that the window through which Lee had taken the Photograph was a one-way mirrored window."; and (ii) Paragraph 173, claiming that "[f]ollowing the arrest of Lee, Defendant Schultzel gave false and misleading testimony before a Grand Jury." *See* ES Sanctions Mem. at 4-5. As discussed above, neither of these specific allegations were referenced in the Safe Harbor Notice, rendering the motion procedurally deficient pursuant to both Rule 11 and applicable principles of Due Process.[29] Notably, in response to the actual motion (*i.e.*, the first time Plaintiffs were properly on notice of the purportedly sanctionable conduct), Plaintiffs agreed to withdraw paragraphs 108 and 173 of the Complaint.[30] *See* Pltfs.' Sanctions Mem. at 9. Accordingly, the Court respectfully recommends denying Schultzel's motion for sanctions on the basis that the Safe Harbor Notice was deficient, and that once sufficient notice was provided, Plaintiffs sought to withdraw the offending allegations.[31]

---

[29] The motion references additional allegations in the Complaint purportedly lacking an evidentiary basis, *see generally* ES Sanctions Mem., which also were not referenced in the Safe Harbor Notice.

[30] Plaintiffs' motion for leave to amend their Complaint solely to remove these allegations is addressed below. *See* Section II(C), *infra*.

[31] The Court rejects Schultzel's argument that sanctions are warranted because Plaintiffs had adequate notice of the falsities via the motions to dismiss and failed to correct the inaccuracies at that time, *see* ES Sanctions Mem. at 9-10, because Rule 11 requires separate motion practice. *See* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion").

b.      *Substance*

In any event, the Court also concludes that Plaintiffs' cause of action for malicious prosecution against Schultzel is not sanctionable because, although it fails as a matter of law, it is not frivolous to the extent that it has "absolutely no chance of success" such that "no reasonable argument can be advanced." *See Stern*, 844 F.2d at 1005.  Specifically, Plaintiffs allege that: (i) Schultzel initiated the chain of events leading to the investigation, arrest, and prosecution of Lee with the ulterior motive to replace SLG as the licensee operating the Golf Center; and (ii) exaggerated the incident at the onset to make it appear worse than it was, even if he accurately described the Window before the Grand Jury.  Simply stated, this conduct does not rise to a sanctionable level and the Court respectfully recommends denying the motion.

## C.    <u>Motion to Amend</u>

Finally, the Court respectfully recommends denying Plaintiffs' motion for leave to amend their Complaint, which merely seeks to remove the allegedly problematic allegations set forth in Paragraphs 108 and 173, which precipitated Schultzel's motion for sanctions.  Because the Court recommends denying the motion for sanctions and otherwise dismissing the Complaint in its entirety on substantive grounds, the motion for leave to amend should be denied as moot.  In addition, the Court recommends *sua sponte* denying leave to amend the Complaint to address its failure to state any plausible causes of actions because amendment would be futile.

i.    <u>Legal Standard</u>

While leave to amend a complaint should be freely given "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (internal citation omitted). Such relief may be denied for, among other reasons, futility. *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227 (1962)); *see also Reynolds v. City of Mount Vernon*, No. 14-cv-1481, 2015 WL 1514894, at *5 (S.D.N.Y. Apr. 1, 2015) ("a district court may deny leave to amend when … amendment would be futile because the problem with the claim is substantive and better pleading will not cure it.") (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation omitted). In addition, courts may properly dismiss a complaint without granting leave to amend when the plaintiff fails to cross-move for leave to do so in response to the pertinent motion to dismiss. *See Augienello v. Coast-to-Coast Fin. Corp.*, 64 F. App'x 820 (2d Cir. 2003) (holding that dismissal of an action was warranted, in part, due to the plaintiffs' failure to seek leave to amend); *see also Lynn v. McCormick*, No. 17-cv-1183, 2017 WL 6507112, at *7 (S.D.N.Y. Dec. 18, 2017) (*sua sponte* denying leave to amend where the plaintiffs did not request such relief and failed to suggest they were in possession of facts that would cure the pleading's deficiencies).

ii.     Analysis

Applying these standards, the Court first concludes that Plaintiffs' pending motion for leave to file an amended complaint is moot.  Notably, Plaintiffs have not sought leave to amend their Complaint to ameliorate any of the substantive deficiencies identified in the motions to dismiss.  Rather, Plaintiffs merely request "leave … to amend the complaint … to withdraw paragraphs 108 and 173," *i.e.*, the content of Schultzel's motion for sanctions.  *See* Pltfs.' Sanctions Mem. at 19.  As discussed above, the Court respectfully recommends denying the sanctions motion and dismissing the Complaint in its entirety.  *See* Sections II(A)-(B), *supra*. Accordingly, amending the Complaint in the fashion requested by Plaintiffs would serve no purpose and the Court therefore respectfully recommends denying Plaintiffs' motion.

The Court further recommends *sua sponte* denying leave to amend the Complaint to address its substantive deficiencies.  In this regard, Plaintiffs did not seek leave to amend their Complaint in response to either motion to dismiss, which were fully briefed in March 2019. *See* DEs [46], [50].  Further, there is no indication that Plaintiffs possess additional facts that could render their claims plausible because although the Complaint is detailed, it falls far short of stating any viable causes of action as a matter of law.  Accordingly, the Court concludes that the deficiencies outlined herein could not be cured through amendment, and respectfully recommends *sua sponte* denying leave to amend the Complaint as futile.

## III.   Conclusion

For the reasons set forth above, the Court respectfully recommends granting both motions to dismiss and closing this matter.  Specifically, the Court recommends that all claims be dismissed with prejudice, save the contract-based tort claims against Schultzel, which should be dismissed without prejudice.  In addition, the Court recommends denying Schultzel's motion for sanctions and Plaintiffs' cross-motion for leave to file an amended complaint.

## IV.   Objections

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:         Central Islip, New York
               February 21, 2020          /s/ Steven I. Locke
                                          STEVEN I. LOCKE
                                          United States Magistrate Judge